UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JOEL DOUGLAS, et al., ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | No. 2:20-cv-227-LEW |
| ) | |
| SCOTT LALUMIERE, et al., ) | |
| ) | |
| Defendants ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs Joel Douglas, Steven Fowler, and James Lewis claim that Defendants Eric Holsapple, Wayne Lewis, and Russell Oakes are liable to them under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, based on the Defendants' alleged investment of proceeds derived from a racketeering scheme.

The matter is before the Court on Defendants' Motion for Summary Judgment (ECF No. 379), which I grant.

## FACTS

The following narrative is drawn from the parties' statements of material facts, opposing statements, and replies. *See* Loc. R. 56. In the course of my review of the parties' statements I have reviewed the referenced summary judgment record in the light most favorable to Plaintiffs, the non-movants, including by indulging reasonable factual inferences in their favor, but I have not treated as established conclusory assertions,

improbable inferences, or speculation. *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025).

The claims discussed in this Order concern a subset of defendants who had a business relationship with Scott Lalumiere. At the center of this litigation are claims arising out of alleged activities Lalumiere engaged in, through his own companies, related to various real estate holdings. Lalumiere's companies included MECAP LLC, Skyline Realty LLC, and Birch Point Storage LLC. The Defendants who presently seek summary judgment ("Moving Defendants") were not members or managers of any of these entities.

Plaintiffs allege that they were victimized in fraudulent real estate schemes initiated by Lalumiere, acting through one of his companies. In general terms, Lalumiere would "rescue" properties for individuals who were at risk of losing them or who wanted to acquire them. Lalumiere would do so by buying the properties and allowing the former or prospective owners to take possession of the properties while paying rent and, sometimes, performing renovations at their expense. The lease agreements included terms stating that the tenants would be able to buy the properties at a future date provided that they kept up with their rental payments. Rental payments were also, ostensibly, treated as downpayments toward the purchase price. In several situations, Lalumiere would skim the available equity out of the properties by obtaining mortgage financing from banks or private lenders. When he later defaulted on the mortgage loans, the banks would foreclose and the tenants would lose their right to purchase the properties as a consequence of the foreclosure process.

When the Plaintiffs commenced this civil action, they alleged a wide-ranging civil conspiracy to profiteer on Lalumiere's equity skimming schemes. Plaintiffs have named as Defendants virtually every person or entity that ever came into association with the properties, including several banks that loaned Lalumiere funds in exchange for mortgages on the properties, real estate brokers, and other individuals involved in the provision of real estate services. Through this action, the Plaintiffs seek money damages or equitable relief to compensate them financially for their losses.

The primary issue for present purposes is whether Plaintiffs have marshaled sufficient material evidence in support of their claims against the Moving Defendants, Eric Holsapple, Wayne Lewis, and Russell Oakes. One thing that connected Holsapple and Lewis to Lalumiere was the entity LH Housing LLC.

LH Housing LLC was in the business of investing in real estate in Maine. LH Housing was formed in December of 2012. At its formation, Scott Lalumiere and Eric Holsapple each owned 45 percent shares in LH Housing and Wayne Lewis owned a 5 percent share. Another individual, a non-party, owned the remaining 5 percent share. Russell Oakes did not have an ownership stake in LH Housing. LH Housing acquired real estate in several states, including Colorado and Maine. Scott Lalumiere, evidently, had primary responsibility for managing LH Housing's investments in Maine real estate.

After acquiring Maine properties, LH Housing would either rent them or resell them. For a time, Defendants Eric Holsapple and Wayne Lewis, along with Lalumiere, were all members of LH Housing, LLC. But Holsapple and Lewis were not members of Lalumiere's other companies and denied knowledge of Lalumiere's use of those

3

companies. Still, from time to time, Lalumiere would find properties in Maine that LH Housing would acquire.

Unlike Lalumiere, who during the relevant period was located in Maine and had direct dealings with the Plaintiffs, Holsapple and Lewis were located in Colorado and did not participate in any of Lalumiere's sale and lease back transactions with the Plaintiffs, all of which transactions went through Lalumiere's other companies.

Holsapple and Lewis relied on Lalumiere to manage LH Housing's business in Maine. At some point in time, LH Housing's Maine operation had a negative cashflow, and Holsapple and Lewis came to question the viability of the business Lalumiere was conducting in Maine. The other members of LH Housing decided they would part ways with Lalumiere. They arranged for Lalumiere to assume ownership of fourteen properties, which Lalumiere did by transferring them to LH Acquisitions, LLC. As part of that deal, Lalumiere released his membership in LH Housing, but not before pledging his membership interest as collateral for a loan from another Defendant entity, TTJR, LLC.[1]

The following facts concern properties discussed in the Amended Complaint (ECF No. 11) in which one of the Plaintiffs maintained an interest.[2]

---

[1] By 2023, LH Housing no longer held any properties.

[2] The Plaintiffs' Amended Complaint and Response in Opposition to Summary Judgment reference other properties apparently once owned by nonparties. The Plaintiffs have not, however, developed summary judgment statements that generate genuine issues that the Moving Defendants were complicit in Lalumiere's conduct toward the nonparties. Presumably, the facts associated with these other properties might resemble the facts associated with the Settler Road property, which also involved a nonparty.

### 33 Sanborn Lane, 181 St. John Street, and 16 Old Ben Road

The Amended Complaint alleges failure to sell the properties identified as 33 Sanborn Lane, 181 St. John Street, and 16 Old Ben Road to Plaintiff Fowler. Fowler claims he had an oral promise from Lalumiere to purchase the three properties and invested money in the properties, but that Lalumiere failed to convey the properties to him. The properties do not appear to be linked in any way to LH Housing or the Moving Defendants.

### Settler Road

The Amended Complaint alleges that the "Settler Road Fraud Scheme" was executed through Skyline Realty Services, Inc. On April 27, 2012, an individual who is not a party to the case transferred the property on Settler Road to Skyline. Skyline then transferred the property to Melissa Lalumiere. She then transferred the property back to Skyline and Skyline obtained a mortgage through Androscoggin Savings Bank. Androscoggin Savings Bank foreclosed on the property but the individual was able to purchase it back at a higher price than promised to him by Lalumiere. These events occurred in the same year as LH Housing's formation, but the summary judgment record does not indicate that LH Housing or the Moving Defendants were involved.

### 57 Beach Street

The so-called Beach Street scheme relates to Plaintiff James Lewis's home at 57 Beach Street in South Portland. Plaintiff Lewis (no relation to Defendant Lewis) acquired this property through inheritance. He attempted to borrow money to pay off the existing mortgage but could not get financing. Lewis turned to MECAP, from which he obtained financing.

The property was repeatedly refinanced through different companies, including Milk Street Capital and Coastal Realty Capital. Lewis stopped making payments to Coastal Realty because they did not fulfill alleged promises to lend him more money. Coastal Realty Capital moved to foreclose on the property, at which point Lewis sold the property. Lewis was able to pay off the debt and realized proceeds from the sale.

<u>661 Allen Avenue</u>

Plaintiff Fowler owned 661 Allen Ave, Portland, for several years. Fowler transferred the property to Birch Point, a Lalumiere company, retaining a right to lease and an option to purchase. Birch Point encumbered the property with a mortgage from Androscoggin Savings Bank. LH Holdings (not LH Housing), a Holsapple entity, held a second mortgage on the Allen Avenue property, a mortgage interest it obtained when it acquired a note from TTJR LLC, the circumstances of which relate to the separation of Lalumiere from LH Housing. Prior to the separation of Lalumiere from LH Housing, Lalumiere borrowed money from TTJR LLC and pledged as collateral both his membership in LH Housing and his interest in 661 Allen Avenue. When Holsapple and Lewis parted ways with Lalumiere, Holsapple formed LH Holdings to purchase TTJR's note to lift the lien on Lalumiere's LH Housing shares. By acquiring the TTJR note, LH Holdings became the successor to TTJR in terms of its security interest in 661 Allen Avenue because Lalumiere had used both the Allen Avenue property and his LH Housing shares as collateral for the TTJR note.

On December 20, 2019, Defendant Wayne Lewis asked Russell Oakes for a broker's opinion of value for 661 Allen Avenue for LH Housing. Androscoggin Savings Bank

eventually foreclosed on the property. From the foreclosure sale's proceeds, LH Holdings recovered some but not all of the money it invested to secure the note from TTJR associated with Lalumiere's pledge of his LH Housing shares as collateral.

<u>75 Queen Street</u>

LH Housing owned a property at 75 Queen Street in Gorham, Maine, where Plaintiff Joel Douglas resided. After Holsapple and Lewis terminated Lalumiere's membership in LH Housing, Holsapple and Lewis discovered that Plaintiff Douglas claimed rights to the Queen Street property.

Douglas claims that on May 19, 2015, Lalumiere falsely promised in a Purchase and Sale Agreement that Douglas could purchase 75 Queen Street from MECAP, LLC, for $275,000, on June 30, 2016.

In or around December 2019, Wayne Lewis became aware that rents for 75 Queen Street were not being deposited to LH Housing's account, but he was unaware whether rents were being paid or, if so, to whom.

In January 2020, Russell Oakes went to 75 Queen Street to speak with Joel Douglas. Douglas told Oakes that he thought he owned 75 Queen Street and was in possession of the property's deed. Through that interaction, Oakes and Wayne Lewis understood that Douglas believed he had an agreement with MECAP, LLC giving him the option to purchase the property.

Holsapple and Lewis, on behalf of LH Housing, offered to sell the property to Douglas at market value. Douglas was not able to get financing and could not buy the

property. Ultimately, LH Housing brought a forcible entry and detainer action and lawfully secured possession of 75 Queen Street from Douglas.

*

Unlike Moving Defendants Holsapple and Lewis, Moving Defendant Russell Oakes was never a member of any entity at issue in this case. After Lalumiere left LH Housing, LH Housing hired Oakes for his property management skills and knowledge of the Maine real estate market. Oakes performed services for LH Housing such as inspections, deliveries, and referrals to real estate professionals. Oakes knew Lalumiere from the 1990s when they both worked at the Boulos Company, another property management company. Oakes later formed his own company, where he provided construction inspections, property management services, and miscellaneous tasks relating to property management. From 2012 until 2018, Oakes provided these services as an independent contractor to MECAP. Oakes terminated his relationship with MECAP after a payment dispute with Lalumiere in 2018. Oakes did not know about the structure of the various entities named in the Amended Complaint.

*

Plaintiff Joel Douglas testified at his deposition that he did not know how to link the Defendants, did not know how they were in business together, and did not know any facts to support the allegations in the Amended Complaint. Douglas could not provide any facts to support his suspicion that Holsapple and Lewis were trying to take his home and testified that he has never spoken to either of them.

Plaintiff James Lewis testified at his deposition that he has no idea why he sued the Moving Defendants and did not know who was involved in the conspiracy or what it was about other than mortgage issues. Lewis testified he had no specific information about Holsapple, Lewis or Oakes' involvement in the alleged conspiracy.

Plaintiff Steven Fowler testified that Steve Matthews (non-party) was Lalumiere's "lending guy and that's who I worked with." When asked for all of the facts that support Fowler's conjecture that Lalumiere did not work alone in his scheme, Fowler referred to his attorney. Fowler's view of the case is that he lost his house, he believes by the wrongful acts of Lalumiere, and he sued Holsapple, Lewis, and Oakes because he believes there must be a conspiracy that he would uncover through cross-examination. Fowler worked with Lalumiere for several years buying and rehabbing properties. Fowler used Lalumiere as a private lender on several properties. Fowler had significant business interests and mutual trust working with Lalumiere. Fowler claimed he had identified several properties that he had wanted to buy from Lalumiere, including 33 Sanborn Lane, but when Lalumiere left the area the transactions did not go through, in part because the properties had second mortgages and liens attached to them.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that has the potential to determine the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To raise a genuine issue of material fact, the party opposing the summary judgment motion must

demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in their favor. *See Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case."). "If the court finds that no genuine issue of material fact exists and that no reasonable jury would favor the nonmoving party, then it must grant the moving party's motion." *Quintana-Dieppa*, 130 F.4th at 7.

## Allegations and Arguments

Based on a review of the Amended Complaint (ECF No. 11), Plaintiffs allege that Moving Defendants Eric Holsapple, Wayne Lewis, and Russell Oakes were participants in an illegal enterprise, in association with Scott Lalumiere, that used a pattern of racketeering activity to conduct its affairs. These claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961-1968. More specifically, Plaintiffs allege that the Moving Defendants conducted an enterprise comprised of Skyline Realty Services Inc., Birch Point Storage LLC, LH Housing LLC, and MECAP LLC through which they "conspired to use a pattern of mail and wire fraud to take control of property belonging to" Plaintiffs, in violation of 18 U.S.C. § 1962(d). Am. Compl. ¶ 127, 142, 158. The fraudulent scheme, as alleged, was carried out by acquiring ownership of properties based in part on promises that the owners would be able to buy back the properties at set prices, then mortgaging the properties to secure loan proceeds in much larger amounts from area banks that would, eventually, foreclose on the properties, resulting in the former owners' loss of the equity they had in the properties. In the

meantime, the original owners would pay rents that would offset the enterprise's expenses. As alleged, Defendants would "take control and realize the equity in the property that they otherwise would not be entitled to while increasing their transactional profits with fees and interest on the funds provided to the Enterprise but paid by the victims." *Id.* ¶¶ 128, 159, 176.[3]

Plaintiffs further allege that "Eric Holsapple was the money man providing the initial funds to gain control of the victim's property, Wayne Lewis was [a] go between who communicated Mr. Holsapple's directions, and Scott Lalumiere recruited victims and secured control of the[ir] propert[ies.]" *Id.* ¶ 174. As alleged, these individuals used MECAP, LH Housing, and Birch Point Storage as their property holding entities. *Id.*

In their Motion for Summary Judgment, the Moving Defendants do not attempt to contest whether there is a genuine issue of material fact concerning the fraudulent nature of the sale-and-lease-back or equity-skimming activities described in the Amended Complaint. Instead, they assert that the alleged schemes were all carried out by Scott Lalumiere through his own entities and that the record will not support a finding that they conspired with Lalumiere or joined him in a fraudulent enterprise. Motion at 7. The Moving Defendants assert that there is no evidence capable of supporting a finding that they had any role in or connection to the operations of Skyline Realty, Birch Point, or

---

[3] The claim is repeated in Counts I through IV, which is explained by the inclusion of different groups of conspirators in different counts that relate to different properties. Defendants Holsapple and Lewis are named in all four RICO counts. Defendant Oakes (sometimes misspelled "Oaks") is named only in the RICO claim in Count IV. There are many more claims asserted against Moving Defendants in the Amended Complaint, but they were dismissed by prior order. Order on Mots. to Dismiss (ECF No. 244).

MECAP, entities owned or operated by Lalumiere alone, and that the record will not show that the transactions involving false promises were conducted by or on behalf of anyone other than Lalumiere. *Id.* at 8.

Although Moving Defendants Holsapple and Lewis can be connected to Lalumiere through their interests in LH Housing, they maintain that there is no evidence in the record to support a finding that they were aware of the promises Lalumiere made to the Plaintiffs. *Id.* at 9. Additionally, they say that the only property in issue that LH Housing came to own was 75 Queen Street, which Lalumiere transferred from MECAP to LH Housing after first acquiring it through MECAP and as part of Lalumiere's departure from LH Housing. Furthermore, as to 75 Queen Street and the alleged defrauding of Douglas, they note that Douglas never owned 75 Queen Street and never attempted to exercise his purchase option within the terms of the option, so the claim may not be viable as to Lalumiere, let alone them. *Id.*

As for Moving Defendant Oakes, he asserts that he is even more removed from the alleged scheme because he never had any ownership interest in any of the companies described in the Amended Complaint and did not know who had what interest in whichever companies Plaintiffs say were part of the RICO enterprise. *Id.* at 10.

From there, the Moving Defendants go on to discuss other elements of a RICO claim that they say are missing, including proof of a common purpose of engaging in a course of racketeering activity. *Id.* at 10-12. The Moving Defendants also discuss shortcomings in regard to each Plaintiff's unique circumstances, suggesting they do not depict a pattern. *Id.* at 12-16. The Moving Defendants conclude their Motion with a challenge related to the

12

fact that Plaintiffs cite subsection (a) of RICO section 1962, but not subsection (c). The Moving Defendants observe that Plaintiffs' RICO claims, as a consequence, turn on the existence of an investment enterprise rather than an enterprise formed to engage in the predicate acts involving fraudulent inducement of real estate transactions. Motion at 16-17.

In response, Plaintiffs agree that their RICO claim is limited to a reinvestment scheme, stating that they "have not asserted [a] 1962(c) claim that they have been damaged by the underlying predicate acts of mail and wire fraud," and instead "have asserted a claim that they have been damaged because the equity in their property has been drained by Mr. Lalumiere's investment back into the enterprise and that Eric Holsapple, Wayne Lewis, and Russell Oakes conspired with Mr. Lalumiere to further that investment." Response at 4-5. Of the various properties, the Plaintiffs observe that LH Housing did obtain an interest in two: 75 Queen Street and 661 Allen Avenue. Evidently, Plaintiffs maintain that so long as Lalumiere generated proceeds from fraudulent acts that eventually accrued to the account of a Moving Defendant, that Moving Defendant's participation in a RICO investment enterprise is established.

Analysis

Proof of a civil RICO claim requires evidence of a violation of 18 U.S.C. § 1962 coupled with an injury caused by the violation. 18 U.S.C. § 1964(c); *Efron v. UBS Fin. Servs. Inc. of P.R.*, 96 F.4th 430, 437 (1st Cir. 2024). Because RICO prohibits enterprise action involving a pattern of racketeering, 18 U.S.C. § 1962(a)-(c), and conspiracies to engage in the same, *id*. § 1962(d), it is essential that RICO plaintiffs be able to prove the

existence of an enterprise conducted through racketeering or a conspiracy to start one. In all, the four key elements of a civil RICO claim are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering. *Efron*, 96 F.4th at 437.

In terms of the enterprise element, RICO demands proof of "the creation of an 'enterprise'—a group with a common purpose and course of conduct." *Boyle v. United States*, 556 U.S. 938, 950 (2009). An enterprise can include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As for a conspiracy, "the plaintiff must show that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators to further the endeavor, which, if completed, would satisfy all the elements of a substantive RICO offense." *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023), *cert. denied,* 144 S. Ct. 621 (2024) (cleaned up).

In terms of proving racketeering, it can involve a variety of predicate acts, including mail fraud or wire fraud. 18 U.S.C. § 1961(1). And in terms of proving prohibited activities involving the investment of racketeering proceeds, which Plaintiffs assert as their objective, the relevant statutory language states as follows:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

Based on this language, Plaintiffs contend that the Moving Defendants would be liable if the Moving Defendants received income derived from Lalumiere's racketeering activity (regardless of whether they were complicit in Lalumiere's schemes) and invested it to fund their own enterprise engaged in interstate commerce (whether or not that enterprise is otherwise tainted by racketeering activity). However, to succeed with such a claim, they would also have to prove that the Moving Defendants' receipt and investment of funds in their own operations proximately caused the harm of which Plaintiffs' complain (their lost equity and/or lost real estate opportunities). *Efron v. UBS Fin. Servs. Inc. of P.R.*, 96 F.4th 430, 437 (1st Cir. 2024); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006); 18 U.S.C. § 1964(c).

As a preliminary matter, before turning to the RICO section 1962(a) investment claim, it still appears to be necessary to consider whether Plaintiffs' section 1962(d) conspiracy claim fails against the Moving Defendants to the extent of any underlying racketeering activity engaged in by Lalumiere. My reading of Plaintiffs' Response (ECF No. 386) is that they do not intend to advance that claim. However, they elsewhere appear to insist that the conspiracy is demonstrated while simultaneously saying it is irrelevant. Response at 18-19. Since the Moving Defendants have challenged any such contention, and for the sake of certainty, I find that the record is in fact devoid of evidence that would permit a finding that the Moving Defendants "knowingly joined" such a conspiracy, "agreeing with one or more coconspirators to further the endeavor, which, if completed, would satisfy all the elements of a substantive RICO offense." *Douglas*, 63 F.4th at 55. The record simply does not support a nonspeculative finding that the Moving Defendants

15

knowingly engaged in a pattern of racketeering activity involving predicate acts of mail fraud or wire fraud to cheat the Plaintiffs out of their respective interests in the subject properties.

As for section 1962(a), I am also persuaded that no reasonable finder of fact would be able to conclude that the alleged investments that the Moving Defendants made were the proximate cause of the Plaintiffs' injuries rather than Lalumiere's alleged, predicate acts of fraud (*i.e.*, false buy-back promises), skimming of equity through mortgage transactions, and default leading to foreclosures. "The proximate-cause inquiry . . . requires careful consideration of the 'relation between the injury asserted and the injurious conduct alleged.'" *Anza*, 547 U.S. at 462 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). It is imposed in these cases to afford a "judicial tool used to limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268.

What the Plaintiffs would be able to prove is that LH Housing existed when Lalumiere was conducting his schemes, not that LH Housing (or its other principals) joined Lalumiere in an unlawful enterprise or conspired with him to profit from false buy-back promises made to the Plaintiffs. As to the latter, a factfinder could, on this record, only speculate. The Plaintiffs might also prove that the Moving Defendants came to be aware of Lalumiere's false dealings with Plaintiffs, his financial difficulties, and his lack of reliability, but not before Lalumiere had closed on the fraudulent transactions that harmed the Plaintiffs using entities that the Moving Plaintiffs did not own or operate. Assuming that the Moving Defendants' later-obtained knowledge might be material to the section

1962(a) claim, the Plaintiffs would still need to demonstrate that their injury (the loss of their equity or opportunity) was the product of some prior investment of the Moving Defendants. I do not find this component of the claim in the record.

Plaintiffs argue that the Moving Defendants made the proscribed investment when they "evict[ed] Mr. Douglas and sold 75 Queen Street" and when they "acquired any remaining equity that may be available to Mr. Fowler after the foreclosure sale on 661 Allen Avenue." Response at 21. But the realization of a gain is, presumably, distinct from an investment leading to injury because the injury (Plaintiffs' respective loss) has already transpired. The subsequent investment of the proceeds must produce its own harm. Plaintiffs evidently believe that the Moving Defendants were required to honor Lalumiere's promises or perhaps rescue the Plaintiffs in regard to certain properties (Fowler with Allen Avenue and Douglas with Queen Street[4]), but the Moving Defendants' noninvestment in Fowler and Douglas cannot be the investment that produced their injury. And such an obligation would arise only if the Moving Defendants were complicit in the underlying scheme, meaning they were subject to liability for the predicate acts of fraud, the section 1962(c) claim that Plaintiffs disavowed.

That leaves only the residual notion that the Moving Defendants, to the extent that they succeeded in obtaining an interest in a property tainted with money from Lalumiere's misdeeds, may have realized proceeds that they then invested in some other real estate

---

[4] Plaintiff Lewis appears to fall away in the Plaintiffs' Response. Lewis dealt exclusively with Lalumiere entities and sold his property, 57 Beach Street, at a profit. It is not apparent how he was harmed by an investment that might have been undertaken by the Moving Defendants.

17

enterprise that did not involve the Plaintiffs. But there is no evidence to show that any such reinvestment proximately caused Plaintiffs their alleged harms that underlie this civil action.[5] That is probably all that needs to be said. However, it is also worth mentioning how attenuated the case against the Moving Defendants is when one considers the properties associated with the Plaintiffs.

The circumstances related to most of the properties do not appear to implicate the Moving Defendants or LH Housing at all. The record presented concerning Sanborn Lane, St. John Street, Old Ben Road, Beach Street, and Settler Road[6] does not reveal that LH Housing or the Moving Defendants obtained an interest or realized any proceeds that they might reinvest for purposes of Plaintiffs' section 1962(a) claim. In the absence of such evidence, I do not see how the transactions concerning these properties substantiate Plaintiffs' section 1962(a) investment claims. That leaves Allen Avenue and Queen Street. Conceivably, both Lalumiere's false promises and his investment in these properties proximately caused harm to Fowler and Douglas. But their harm was not the product of an investment by the Moving Defendants.

With regard to Allen Avenue, a property once owned by Fowler that Androscoggin Savings Bank eventually foreclosed on, the record demonstrates that Moving Defendant Holsapple obtained a secured interest in the property by purchasing third-party TTJR's note, and that in doing so he preserved his interest in LH Housing shares that Lalumiere

---

[5] I fail to see how one might even speculate on this record that Russell Oakes stood to garner proceeds for purposes of a prohibited (re)investment in an enterprise.

[6] None of the Plaintiffs had an interest in the Settler Road property.

had pledged as collateral for the note. LH Housing was not a party to any of the relevant transactions, and although Holsapple was in the picture, I am not persuaded that his post-foreclosure partial recovery of funds spent to secure the TTJR note amounted to the investment of proceeds from a racketeering enterprise or was an investment that produced Fowler's injury.

As for 75 Queen Street, there is no evidence that Plaintiff Douglas ever owned the property. Evidently, Lalumiere provided Douglas with an option to buy the property on or by a certain date, but the purchase did not occur. Consequently, although this is a property that was owned by LH Housing in whole or in part, it does not fit the sale-and-lease-back-scheme pattern that supposedly animates this case.[7] Nor is it apparent how the investment of proceeds obtained from the sale of the property was a proximate cause of Douglas's harm.

In summary, Plaintiffs have presented a puzzle that is missing the critical pieces needed to put the Moving Defendants in the picture. Although one can surmise that Moving Defendants Holsapple and Lewis might potentially belong in the picture, mostly because of the discontinued LH Housing enterprise they had some participation in with Lalumiere, I fail to appreciate how a jury could reliably leverage that connection into a verdict for Plaintiffs on either the section 1962(a) RICO investment claim or related section

---

[7] The Plaintiffs see LH Housing's ownership of 75 Queen Street as particularly advantageous to their claim. They say that communications between Lalumiere, Holsapple, and Lewis demonstrate their joint involvement in Lalumiere's fraud scheme. Response at 9. Based on my review of the summary judgment statements and the portions of the record cited therein, such evidence does not appear to be of record.

1962(d) conspiracy claim (any more than the underlying section 1962(c) fraud scheme that Plaintiffs have not asserted) without engaging in speculation.

## CONCLUSION

For the reasons outlined above, Defendants' Motion for Summary Judgment (ECF No. 379) is GRANTED.

SO ORDERED.

Dated this 6th day of May, 2025.

/s/ Lance E. Walker
Chief U.S. District Judge